UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SECURITIES AND EXCHANGE COMMISSION,       )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        Case No.
                                          )
DANIEL THIBEAULT                          )
GL CAPITAL PARTNERS, LLC                  )
GL INVESTMENT SERVICES, LLC               )        JURY TRIAL DEMANDED
GRADUATE LEVERAGE, LLC (d/b/a GL          )
ADVISOR and GL HOLDINGS CORP.)            )
TAFT FINANCIAL SERVICES, LLC              )
                                          )
                Defendants,               )
        and                               )
                                          )
SHAWNET THIBEAULT,                        )
GL ADVISOR SOLUTIONS, INC.                )
                                          )
                Relief Defendants.        )
_____ )

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

the following against Defendants Daniel Thibeault ("Thibeault"), GL Capital Partners, LLC

("GL Capital"), GL Investment Services, LLC ("GLIS"), Graduate Leverage, LLC ("GL"), and

Taft Financial Services, LLC ("Taft") and Relief Defendants Shawnet Thibeault, and GL

Advisor Solutions, Inc., and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.      This matter involves ongoing dissipation of misappropriated investor

funds.  Massachusetts-based registered investment adviser GL Capital and its principal,

Thibeault, misappropriated at least $16 million of the money that belonged to a closed-end interval fund they managed, the GL Beyond Income Fund (the "Fund"). The Fund's assets consist primarily of individual variable rate consumer loans. From at least 2013 to the present, Defendants engaged in a scheme to create fictitious loans to divert investor money from the Fund, reported these fake loans as assets of the Fund, and thereby concealed the fact that Thibeault and the other Defendants had misappropriated millions of dollars from the Fund. The Defendants' scheme involved the fabrication of paperwork purporting to reflect numerous six-figure consumer loans using the names and personal information of individuals who were unaware that loans were being originated in their names. Fund money was disbursed to make these fictitious loans, but the money did not go to the purported borrowers. Instead, it went to the Defendants and the Relief Defendants. The Defendants and Relief Defendants appear to have used the money for personal and business expenses, and also for making interest payments on outstanding fictitious loans (thereby perpetuating the scheme and avoiding detection). It appears that these fictitious loans comprised at least two-fifths of the Fund's total reported assets of approximately $40 million as of September 2014.

2.      Defendants solicited investments in the Fund by representing that investors' money would be pooled and used to make or purchase consumer loans. These consumer loans would then constitute assets of the Fund, and would provide a return to investors when interest and principal payments were made on the loans. From at least 2013 to the present, however, Defendants took investors' money from the Fund to finance fake loans. Once these fictitious loans were originated, that money was improperly diverted to the Defendants, rather than the individuals who were listed as borrowers. Defendants misappropriated the money from these fake loans and used it for their own personal expenses and to run businesses other than the Fund.

2

3.     Through the activities alleged in this Complaint, Defendants have engaged in fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act").  Additionally, Daniel Thibeault, GL Capital Partners, and GLIS, each of whom acted as an investment adviser, employed devices, schemes and artifices to defraud their investment advisory clients and engaged in acts, transactions, practices and courses of businesses which operated as a fraud on their investment advisory clients, in violation of Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act").

4.     To halt the defendants' ongoing unlawful conduct, maintain the status quo, and preserve any remaining assets for defrauded investors before entry of a final judgment, the Commission seeks emergency equitable relief, including a temporary restraining order and preliminary injunction, to:

    a.  prohibit Defendants from continuing to violate the relevant provisions of the federal securities laws;

    b.  freeze the Defendants' and the Relief Defendants' assets and otherwise maintain the status quo;

    c.  require Defendants to submit an accounting of investor funds and all other assets in their possession;

    d.  require Defendants and the Relief Defendants to repatriate assets that were transferred outside of the United States that are traceable to investor funds;

    e.  prohibit Defendants from soliciting or accepting additional investments;

    f.  prevent Defendants from destroying relevant documents; and,

    g.  authorize the Commission to take expedited discovery.

5.      The Commission also seeks

   a.   the entry of a permanent injunction prohibiting Defendants from
        further violations of the relevant provisions of the federal securities
        laws;

   b.   disgorgement of Defendants' ill-gotten gains, plus pre-judgment
        interest;

   c.   disgorgement by the Relief Defendants of all unjust enrichment and/or
        ill-gotten gain received from Defendants, plus prejudgment interest;
        and,

   d.   the imposition of civil penalties due to the egregious nature of
        Defendants' violations.

## JURISDICTION AND VENUE

6.      The Commission seeks a permanent injunction and disgorgement pursuant to

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act

[15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  The

Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and

Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

7.      The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of

the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa], and Sections 209(d), 209(e) and 214 of the Advisers

Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

8.      Venue is proper in this District because, at all relevant times, GL, GL Capital

Partners, and GLIS maintained offices in Massachusetts; Taft conducted business in

Massachusetts; and Daniel and Shawnet Thibeault maintained a residence in Massachusetts.

9.      In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

10.      Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

11.      **Daniel Thibeault ("Thibeault")**, age 40, lives in Framingham, Massachusetts. He is the principal owner, President, and CEO of GL.  In that position, which he has held since 2003, he directs marketing and investment strategy and investment selection. Since GL Capital was formed, Daniel Thibeault has also been its Managing Director, and he has assisted in the execution of its investment strategies and marketing.  He was also the Fund's co-portfolio manager.  He shared primary responsibility for management of the Fund's investment portfolio and served the Fund in this capacity since it commenced operations in 2012 until he was terminated by the Fund in December 2014 (except for the period December 12, 2012 to February 22, 2013).  Thibeault is also the founder, owner, and principal of GL Advisor Solutions, Inc., a Philippines corporation.  On information and belief, Thibeault also founded and controls Taft.

12.      **Graduate Leverage, LLC**, ("GL") is a Massachusetts limited liability company whose principal place of business is Waltham, Massachusetts.  It is an asset management and financial advisory firm that was founded by Daniel Thibeault in 2003.  GL's Managing Member and majority owner is Daniel Thibeault. During all relevant times, Thibeault has controlled GL and directed its day-to-day activities.  GL now operates multiple investment and financial

advisory businesses, including GLIS, GL Capital, GL Insurance Services, LLC, and PeakFolio, LLC. GL does business under several different names, including GL Loan Servicing, GL Holdings Corp., GL Capital Management, LLC, GL Advisor, LLC, and GL Advisory Services. GL also maintains an office in the Philippines, under the name GL Advisor Solutions, Inc. As of December 9, 2014, GL had about 24 employees in its Waltham, Massachusetts office and about 130 employees in the Philippines office.

13. **GL Capital Partners, LLC** ("GL Capital") is a Massachusetts limited liability company, which shares a principal place of business with GL in Waltham, Massachusetts, and was formed in November 2011. GL Capital is an investment adviser, registered with the Commission. The principal owner of GL Capital is GL. From January 17, 2012, until it was terminated on December 17, 2014, GL Capital was the sole investment adviser of the Fund. In exchange for its advisory services, GL Capital was paid management fees by the Fund. During all relevant times, Thibeault controlled GL Capital and directed its day-to-day activities. GL Capital also has staff at GL's Philippines office.

14. **GL Investment Services, LLC** ("GLIS") is a Massachusetts limited liability company, which shares a principal place of business with GL in Waltham, Massachusetts. GLIS is an investment adviser, registered with the Commission. According to its website, GLIS is "an independent advisory firm that provides customized wealth management and investment management services to clients throughout the United States." The September 22, 2014 investment adviser registration document (the "Form ADV") that GLIS filed with the Commission states that, as of that date, GLIS had approximately 700 clients and more than $130 million in assets under management. GL is the sole member of GLIS. Daniel Thibeault is an indirect owner of GLIS, as the majority owner and control person for GL.

15.     **Taft Financial Services, LLC ("Taft")** is a limited liability company formed under the laws of the state of South Dakota in December 2011 whose principal place of business is ostensibly in Hutto, Texas.  Taft is nominally run by an individual named Eric Kratzer, and has an address of 107 Grant CV, Hutto, TX.  However, upon information and belief, Daniel Thibeault and GL control Taft.

## RELIEF DEFENDANTS

16.     **GL Advisor Solutions, Inc.** is a Philippine corporation that, on information and belief, engages in the origination and servicing of loans for GL and its affiliates and performs other services for clients of GL and its affiliates.  GL Advisor Solutions, Inc. is 99% owned by GL, and is controlled by GL and Daniel Thibeault.

17.     **Shawnet Thibeault**, age 36, lives in Framingham, Massachusetts.  She is a partial owner of GL.  Shawnet Thibeault is the wife of Daniel Thibeault.

## STATEMENT OF FACTS

**THE FUND**

18.     Daniel Thibeault created the Fund on or about March 23, 2012.  It is a Delaware statutory trust.  From the creation of the Fund until on or about December 17, 2014, Daniel Thibeault held or shared primary responsibility for the management of the Fund's investment portfolio as the Fund's portfolio manager or co-manager (except, according to the Fund's 2014 prospectus, for the period between December 12, 2012, and February 22, 2013).  Daniel Thibeault is also listed in Fund documents as the Fund's Chairman, President, and one of the Fund's Trustees.

19.     The Fund's prospectus describes it as "a continuously offered, diversified, closed-end management investment company that is operated as an interval fund."  GL Capital's website characterizes the Fund as providing investors with "direct access to a portfolio of high credit quality consumer debt predominantly from young professionals."  The website states that the Fund returned 10.17 percent in the year ended September 30, 2014, and has an annualized return rate of 9.23 percent since the Fund's inception on March 23, 2012.

20.     The Fund's offering documents and latest annual report state that its assets primarily consist of consumer loans and business loans.  That is, the Fund used investor money to purchase, and sometimes to make, consumer loans.  These loans were counted as assets of the Fund.  The interest payments on these loans were identified as the source of the reported return on the investments made by the Fund.

21.     According to the Fund's Fact Sheet:

The Fund is a managed portfolio consisting primarily of individual variable rate consumer loans. Proprietary loan sourcing channels allow us to seek doctors, dentists and other professionals from top institutions. Drawing upon its market access, the Fund attempts to produce high-yielding assets while maintaining stringent and uncompromising underwriting criteria. The goal of the fund is to offer access to low duration, low beta debt instruments with superior risk-adjusted return profiles.

22.     The Fund's June 2014 prospectus describes the Fund's investment objective as "investing primarily in individual variable-rate interest income-producing debt securities (i.e. loans made to individuals that are represented by a note (the 'security'))."  The prospectus further states that the "Fund acquires notes in both the secondary market and through direct origination with individuals."  It describes the Fund's investment strategy as involving "select[ing] securities by identifying note issuers that [GL Capital] believes have satisfactory credit quality- those able and willing to repay their interest and principal." It explains: "When

evaluating credit quality the Adviser uses a proprietary underwriting (credit review) model that relies on inputs such as commercial credit scores and Adviser-generated  assessments of an issuer's total debt burden relative to income, other sources of repayment such as liquid assets, payment history including delinquencies and defaults."   It also states that the "Adviser is supported by a research staff as well as by an investment committee that reviews each potential Fund investment."

23.    GL serviced these loans once they were part of the Fund's assets.  It tracked loan payments and contacted borrowers if payments were missed.

24.    The Fund's 2014 annual report contains a lengthy table titled "Portfolio of Investments" that purports to identify each loan in the Fund's portfolio as of January 31, 2014. For each loan, the table lists a principal amount, an applicable interest or "coupon" rate, a maturity date, and the resulting overall value of the loan. The loans are individually labeled with a loan number, generally consisting of nine digits, followed by two letters, followed by two more digits. For example, loan number "000169779PL01" is listed as having a principal balance of $24,705, a coupon rate of 5.90 percent, a maturity date of November 20, 2027, and a value of $27,773.

25.    The Fund's Daily Valuation Report dated December 8, 2014, lists approximately $35.65 million in consumer loans.  In addition, the Fund's End-of-Day Report for that day lists $385,000 in U.S. equities and $6.55 million in promissory notes issued from the Fund to an entity by the name of LAOH Capital LLC.  Thus, the Fund's records show approximately $42.585 million in total assets as of December 8, 2014.

**DEFENDANTS' FRAUDULENT USE OF INVESTORS' MONEY**

26.    At some point in time, on information and belief, GL became unprofitable and began losing money.

27.    Upon information and belief, starting in early 2013, Thibeault began a scheme to use the Fund's money to support his faltering financial advisory businesses, including GL, GL Capital and GLIS.   His scheme started by taking Fund money and creating paperwork for fictitious loans, the proceeds of which, rather than being paid to bona fide borrowers, were instead transferred to Taft and then transferred by Taft into bank accounts controlled by GL. Upon information and belief, Taft was an entity created at the direction of Daniel Thibeault, and Taft's origination and incorporation documents were prepared by GL staff at the direction of Daniel Thibeault.  On information and belief, an individual named Eric Kratzer is listed as signatory on Taft's Bank of America bank account, and nominally controls Taft, but does so at the direction of Daniel Thibeault.

28.    To cover up his actions, Thibeault prepared forged promissory notes in the names of real individuals who had never requested, nor been provided, a loan by the Fund.  Thibeault directed that periodic interest payments be made on some of the fraudulent loans to give the appearance that the borrowers were current on the loans.  At least some of Thibeault's "interest payments" on earlier-issued loans were made from a portion of the monies that Thibeault diverted from the Fund by issuing additional fictitious loans.

29.    Part of Thibeault's scheme was to use the fictitious loans to divert a portion of the Fund's assets into the operating accounts of GL and/or other accounts, for purposes other than advancing loan proceeds to the purported borrowers.

30.     Each loan owned by the Fund was assigned a unique number and letter code that, among other things, identified the borrower and the loan program type.

31.     The subset of the Fund's loans that bear the program code "TA" were disbursed through Taft.  On information and belief, Thibeault was responsible for the issuance of the "TA" coded loans. The Fund's December 8, 2014 Valuation Report shows 40 loans bearing the program code "TA," with an aggregate value of approximately $16 million.  The listed principal amount of most "TA" loans is between $300,000 and $500,000 and the average value of these "TA" loans is approximately $399,000.  Each of the "TA" loans was significantly greater in amount than the typical loan made by the Fund.

32.     Typically, for legitimate loans made by the Fund, the Fund wired money to the Fund's custodian, Union Bank, in California.  Union Bank, in turn, wired the loan funds to a transactional bank which, for a fee, formally issued the loans to the borrowers. In due course, Union Bank received and maintained copies of the promissory notes associated with each of the loans closed by the transactional bank.  Typically, Union Bank received promissory notes within approximately one week of the loans' closing

33.     In the case of "TA" loans made by Thibeault through Taft, however, Thibeault directed the money to be wired from the Fund's account at Union Bank to Taft.  From Taft, the money was wired not to individual borrowers, but rather to a GL-controlled bank account at TD Bank.

34.     Union Bank did not receive copies of any promissory notes associated with "TA" loans that were purportedly issued in 2013, despite repeated inquiries to GL, until in or about January 2014—months after those loans had purportedly been issued. To date, Union Bank has

not received copies of promissory notes for "TA" loans held by the Fund that were purportedly issued after January 2014.

35.     GL Capital, as the Fund's investment adviser, had a fiduciary duty to the Fund.

**DOCUMENTATION FOR TA LOANS WAS EITHER ERRONEOUS OR MISSING**

36.     On December 8, 2014, during an examination of GL Capital, staff from the Commission's Office of Compliance, Inspections, and Examinations requested that GL Capital produce promissory notes and other loan documents relating to the "TA" loans.

37.     During the first two days of the exam, GL Capital only produced promissory notes for "TA" loans made before January 31, 2014.  On the third day of the exam, GL Capital produced five more promissory notes for "TA" loans made after January 31, 2014.  GL Capital did not produce any more promissory notes or supporting loan documentation for the "TA" loans as of the close of business on December 10, 2014.

38.     On December 11, 2014, the Federal Bureau of Investigation executed a search warrant on GL's offices.

39.     The loan documents for "TA" loans produced by GL Capital to the Commission staff contain false information regarding the "borrowers" who are listed in the Fund's documentation for these purported loans.

40.     Most of the promissory notes produced to the Commission's examination staff list incorrect dates of birth for the purported borrowers:

| LOAN NUMBER | ORIGINAL LOAN AMOUNT | ORIGINATION DATE | BORROWER DATE OF BIRTH ON PROMISSORY NOTE | BORROWER'S CORRECT DATE OF BIRTH | PROMISSORY NOTE DATE OF BIRTH IS |
|---|---|---|---|---|---|
| 000310001TA01 | $ 426,039.00 | 2/27/2013 | 10/12/74 | 10/14/74 | INCORRECT |
| 000310002TA01 | $ 418,394.00 | 2/27/2013 | 3/9/75 | 11/28/74 | INCORRECT |
| 000310003TA01 | $ 382,847.00 | 2/27/2013 | 6/19/73 | 11/15/67 | INCORRECT |
| 000310004TA01 | $ 378,474.00 | 2/28/2013 | 6/23/74 | 8/20/74 | INCORRECT |
| 000310005TA01 | $ 438,009.00 | 3/12/2013 | 10/16/74 | 9/27/74 | INCORRECT |
| 000310006TA01 | $ 458,921.00 | 3/12/2013 | 10/4/61 | 1/30/63 | INCORRECT |
| 000310007TA01 | $ 472,837.00 | 4/5/2013 | 8/4/75 | 8/4/75 | CORRECT |
| 000310008TA01 | $ 291,384.00 | 4/5/2013 | 8/12/75 | 2/3/76 | INCORRECT |
| 000310009TA01 | $ 471,441.00 | 5/22/2013 | 10/22/74 | 1/10/75 | INCORRECT |
| 000310010TA01 | $ 340,000.00 | 6/14/2013 | 2/10/69 | 12/6/72 | INCORRECT |
| 000310011TA01 | $ 94,482.00 | 7/24/2013 | 8/7/58 | 8/7/61 | INCORRECT |
| 000310012TA01 | $ 343,299.00 | 7/24/2013 | 4/24/75 | 5/13/76 | INCORRECT |
| 000310013TA01 | $ 292,039.00 | 8/7/2013 | 5/18/76 | 4/25/75 | *INCORRECT* |
| 000310014TA01 | $ 328,391.00 | 8/29/2013 | 11/26/1977 | 7/31/77 | INCORRECT |
| 000310015TA01 | $ 487,293.00 | 9/17/2013 | 8/28/1959 | 10/4/1958 | INCORRECT |
| 000310016TA01 | $ 352,138.00 | 10/30/2013 | 3/18/75 | 3/18/75 | CORRECT |
| 000310017TA01 | $ 439,812.00 | 11/13/2013 | 8/19/74 | 8/19/74 | CORRECT |
| 000310018TA01 | $ 419,283.00 | 12/11/2013 | 8/11/74 | 7/30/74 | INCORRECT |
| 000310019TA01 | $ 387,234.00 | 12/26/2013 | 8/3/1966 | 12/13/1969 | INCORRECT |
| 000310020TA01 | $ 276,234.00 | 12/26/2013 | 7/21/77 | 9/9/77 | INCORRECT |
| 000310021TA01 | $ 166,879.00 | 12/26/2013 | 10/25/1975 | 10/29/1975 | INCORRECT |
| 000310022TA01 | $ 372,500.00 | 1/31/2014 | 11/4/1975 | 5/19/1976 | INCORRECT |
| 000310024TA01 | $ 296,758.00 | 2/14/2014 | 4/20/1975 | | NOT PRESENTLY KNOWN |
| 000310028TA01 | $ 381,937.00 | 4/23/2014 | 12/19/1979 | | NOT PRESENTLY KNOWN |
| 000310029TA01 | $ 597,283.00 | 5/8/2014 | 8/10/1975 | 3/23/1980 | INCORRECT |
| 000310033TA01 | $ 562,193.00 | 6/27/2014 | 3/17/1977 | 3/17/1977 | CORRECT |
| | $ 9,876,101.00 | | | | |

41.    The incorrect birthdate information associated with these loans would make it virtually impossible to obtain accurate, or indeed, any, commercial credit scores for a purported

borrower.  Thus, the representation in the Fund Prospectus, that the Fund's Advisor "relies on inputs such as commercial credit scores . . ." appears to be untrue.

**AT LEAST ONE OF THE PURPORTED "BORROWERS" WAS UNAWARE THAT A LOAN HAD BEEN MADE IN HIS NAME**

42.     Although GL had a staff of employees whose responsibilities included counseling delinquent borrowers in an effort to bring their loans current, Thibeault instructed the staff that he preferred to handle the Taft loans personally.

43.     Among the purported recipients of the Taft loans are numerous friends and associates of Thibeault.

44.     One such Taft loan was purportedly issued to an individual identified as Z.W. on or about April 5, 2013, in the amount of $291,384, with a loan maturity date of May 5, 2021. Z.W., who resides in Scottsdale, Arizona, was a college roommate of Thibeault.

45.     The purported "Application and Promissory Note" for the loan to Z.W. identifies the origination date of the loan as April 9, 2013, the scheduled maturity date as May 5, 2021, the loan amount as $291,384, and the "program lender" as "Taft Financial Services, LLC, South Dakota." The note purports to be electronically signed by Z.W.

46.     Notwithstanding Thibeault's instructions to his staff, GL inadvertently sent a loan statement to Z.W. in or about July 2014. The loan statement that was sent listed the loan's principal balance, as of July 16, 2014, as approximately $342,000. The statement listed a maturity date of May 5, 2021. The statement identifies the GL loan number as "000310008TA01."

47.     The Portfolio of Investments contained in the Fund's annual report dated January 31, 2014 lists loan 000310008TA01, with a stated maturity date of May 5, 2021, and a principal balance of $333,875.

48.     In or about July 2014, after receiving the loan statement, Z.W. forwarded it to his accountant, who called GL to inquire about the statement. GL's loan servicing staff forwarded the inquiry to the co-portfolio manager of the Fund who, in turn, forwarded it to Thibeault.

49.     An email forwarding the inquiry to Thibeault stated: "Dan, Please call this borrower below on the loan you originated. I think there was some confusion on the loan and my team didn't know how to handle." Thibeault responded: "Will do."

50.     In the wake of that inquiry, Thibeault told Z.W.'s accountant, in substance, to "tell [Z.W.] not to worry about it."

51.     According to the Affidavit in Support of an Application for a Criminal Complaint, filed December 11, 2014, by an agent of the Federal Bureau of Investigations as part of a Criminal Complaint against Thibeault, on or about December 11, 2014, agents of the Federal Bureau of Investigation interviewed Z.W.  Z.W. stated, in substance, that he had never conducted business with, obtained a loan from, or borrowed money from Thibeault.  Z.W. further stated that he had never heard of Taft or the Fund.

**DEFENDANTS DIVERTED LOAN MONEY FROM THE FUND TO ACCOUNTS THEY CONTROLLED**

52.     Under the guise of making or purchasing "TA" loans, Defendants caused Fund money to be paid, through Taft, to GL- or Thibeault-controlled bank accounts.  From there, the misappropriated investor money was used for personal and business purposes.

53.     For instance, in September 2014 putative loan proceeds were wired from the Fund's bank account to Taft, then from Taft to an account in the name of GL, and finally wired out by GL to pay its business expenses.  In particular, records obtained from Thibeault and/or GL include a loan numbered 000310037TA01, purportedly issued on September 15, 2014 for $285,034 to an individual with the initials T.D.  None of this money was provided to T.D. Instead, on September 15, 2014, at the direction of Daniel Thibeault, $285,034 was wired out of the Fund's account at Union Bank to Taft.  The next day, on September 16, 2014, Taft wired $287,000 to GL's bank account at TD Bank.  Over the next several days, between September 16 and 19, GL paid payroll expenses, credit card bills, and bills associated with the development of applications by another GL subsidiary, and wired $87,000 to a bank account in the name of Relief Defendant GL Advisor Solutions at Union Bank in the Philippines.  Over this three day period, GL's outgoing payments totaled at least $231,826 of the $285,034 taken from the Fund.

54.     Another set of transactions in September and October of 2014 show a similar movement and usage of funds.  Records obtained from Thibeault and/or GL include a loan numbered 000310038TA01, purportedly issued on September 30, 2014 for $647,382 to an individual with the initials A.O.  None of this money was provided to A.O.  Instead, on September 30, 2014, at the direction of Daniel Thibeault, $647,382 was wired out of the Fund's account at Union Bank to Taft.  The next day, October 1, 2014, Taft wired $645,000 to GL's bank account at TD Bank.  Over the next several days, between October 1 and 7, GL paid payroll expenses, credit card bills, rental payments, and made numerous other expenditures. Over this six day period, GL's outgoing payments totaled at least $577,091 of the $647,382 taken from the Fund.  Those payments included sending $150,000 to a bank account in the name of Relief Defendant GL Advisor Solutions at Union Bank in the Philippines, on October 7, and also

16

sending $77,460 to an account in the name of LAOH2 Capital, LLC, at TD Bank, on October 2.

On October 3, 2014, LAOH2 wired $77,453 to the Fund's account at Union Bank.

**DEFENDANTS' FURTHER MISREPRESENTATIONS ABOUT FUND ASSETS**

55.     Thibeault misrepresented that the "TA" loans were bona fide loans to borrowers

in numerous documents and reports, including materials he prepared and distributed to the

Funds' Independent Trustees for their periodic meetings, quarterly reports, and semiannual

reports, as well as in the Fund's 2014 annual report filed with the Commission, which Thibeault

signed as the Fund's president.

56.     Thibeault, GL, and GL Capital made false representations of material fact with

knowledge of their falsity when they misrepresented to potential investors in the Fund that the

"TA"-coded loans were bona fide loans held by the Fund as legitimate investments. Such

misrepresentations were contained in multiple documents and reports prepared by Thibeault, GL,

GL Capital, and GLIS, as well as in the Fund's 2014 annual report filed with the Commission

and signed by Thibeault.

**GLIS BREACHED ITS FIDUCIARY DUTY BY INVESTING ITS CLIENTS IN THE
FUND**

57.     As an investment adviser, GLIS had a fiduciary duty to its investment advisory

clients.

58.     Daniel Thibeault was the head of  GLIS's Investment Committee.

59.     GLIS clients granted GLIS the discretion to make investment decisions in their

accounts.

60.     GLIS's Investment Committee and Daniel Thibeault determined in what investments each of its clients would invest.  GLIS then purchased and/or sold securities in client accounts based on those decisions.

61.     GLIS's website represents that while most financial advisors "offer investors a vast array of actively managed investment strategies, many of which underperform the relevant index and have relatively high fees .... our capital markets team at GL Capital Partners focuses on structuring and managing one optimal allocation of assets that is designed to limit losses in down markets and deliver the highest risk-adjusted returns over time." The website goes on to describe GL's "Optimal Market Portfolio" ("OMP") as incorporating "more than 40 asset classes and 200 asset sectors, not just domestic stocks and bonds." It notes that "[a]ll of our research and trading activities converge on the design and continued recalibration of our singular portfolio," and represents that although "each client portfolio may differ slightly, each is derived directly from our centrally maintained OMP."

62.     The OMP includes an allocation to the Fund, and as a result, in practice, a portion of GLIS's clients' assets are directed to the Fund.

63.     GLIS and Daniel Thibeault solicited investors' money under the pretense that they would invest that money in their clients' best interests.  Instead, GLIS and Daniel Thibeault failed to take reasonable care with GLIS clients' money and misappropriated a substantial share of GLIS clients' money by directing it to the Fund, from which GLIS and Daniel Thibeault and converted it for their own purposes.

**GL CAPITAL AND GLIS FRAUDULENTLY OVERSTATED THEIR ASSETS UNDER MANAGEMENT IN FILINGS WITH THE COMMISSION**

64.    As investment advisers registered with the Commission, GL Capital and GLIS are required by Section 203 of the Advisers Act to keep current an application for investment adviser registration on Form ADV.  [17 C.F.R. § 279.1]  Part I of Form ADV, which is filed with the Commission and made available to the public, requires an adviser to disclose certain material information about its business, including the amount of assets under its management.

65.    On September 18, 2014, GL Capital filed a Form ADV with the Commission. That form represents that GL Capital has, as of September 18, 2104, $40,581,515 in assets under management in the Fund.  This number was false, as almost $16 million of the Fund's reported assets were actually fictitious loans.

66.    On September 22, 2014, GLIS filed a Form ADV with the Commission. That form represents that GLIS has, as of September 22, 2014, $133,679,174 in client assets under management.

67.    During the Commission's examination of GLIS, on December 8-10, 2014, GLIS produced a document explaining its calculation of its assets under management, or AUM. Included in that calculation were multiple assets that were not under management at GLIS, but rather, belonged to GLIS clients and were managed elsewhere or were not managed at all. Additionally, GLIS included in its AUM calculation multiple assets that were not eligible to be counted as asset under management, such as gemstones and real estate.

68.    Investors often consider the amount of an adviser's assets under management when deciding to choose an investment adviser and that information is material to investors.

**MISREPRESENTATIONS TO REGULATORS TO CONCEAL THE SCHEME**

69.     During an interview with Commission staff during the examination of GL Capital on December 8, 2014, Daniel Thibeault, for himself and on behalf of GL, GL Capital, and GLIS made multiple misrepresentations to conceal the fraudulent scheme

70.     Daniel Thibeault stated that (save for the promissory notes issued to LAOH and LAOH2) all loans in the Fund were made to consumers.  As detailed above, this claim was false. Loans were made in the names of Thibeault's friends and associates without their knowledge.

71.     Daniel Thibeault also stated that all loan proceeds were sent either to the borrowers listed on the promissory notes or to borrowers' previous lenders to pay off a previous debt.  He categorically denied that any loan proceeds had been distributed to anyone besides either the borrower/debtor or a bank for the purposes of paying off a debt.  As detailed above, these claims were false.  Loan proceeds were funneled from the Fund, through Taft, to accounts controlled by GL and/or Daniel Thibeault.

72.     Daniel Thibeault further stated that neither he nor GL were making any principal or interest payments on any of the loans in the Fund's portfolio.  That statement was false.  Bank records show that Fund money was channeled through Taft and then to GL- controlled or owned accounts.  On numerous occasions, GL owned or controlled accounts made interest payments purportedly on behalf of the "TA" loan borrowers.

**RELIEF DEFENDANTS OBTAINED PROCEEDS OF THE FICTITIOUS LOANS THAT WERE MADE WITH THE FUND'S ASSETS**

73.     Between December 2012 and November 2014, approximately $8.5 million was transferred from GL's operating account at TD Bank to a bank account in the name of GL Advisor Solutions, Inc. in the Philippines.  Many of these transfers occurred shortly after Fund

money was transferred to Taft to make fictitious loans and then transferred again by Taft to GL's operating account at TD Bank.

74.     For example, as part of the transactions referred to in paragraph 53 above, GL used money obtained from the Fund under the guise of a fictitious loan to send $87,000 to GL Advisor Solutions.  Similarly, as part of the transactions referred to in paragraph 54 above, GL used money obtained from the Fund under the guise of a fictitious loan to send $150,000 to GL Advisor Solutions.

75.     In yet another example, on April 14, 2014, Daniel Thibeault directed the Fund to wire $381,937 to Taft to make another fictitious loan.  On April 23, 2014, Taft wired $350,000 to GL.  On April 25, 2014, GL wired $180,000 to GL Advisor Solutions (in four separate wire transactions).

76.     On information and belief, Relief Defendant Shawnet Thibeault received proceeds of the fictitious loans that were made using the Fund's assets.  For example, as part of the transactions referred to in paragraph 53 above, GL used money obtained from the Fund under the guise of a fictitious loan to pay $20,000 in bills for an American Express card in the name of Daniel Thibeault.  Similarly, as part of the transactions referred to in paragraph 54 above, GL used money obtained from the Fund under the guise of a fictitious loan to pay $46,159 in bills for that American Express card.  The nature of the expenses on the American Express card, such as hundreds of dollars per month for videos on demand and e-reader purchases, and thousands of dollars per month at the iTunes Music Store, as well as several other purchases as home goods stores, suggest that the card was used for personal expenses that benefitted Shawnet Thibeault as well as her husband.

77.    In addition, on November 30 and December 1, 2014, $54,516 was withdrawn from GL's operating bank account, at least in part by Daniel Thibeault, via checking withdrawals and purchase checks.  Two of those checks, which totaled $24,000 and were written to "cash," appear to have been endorsed and tendered by Shawnet Thibeault on December 1, 2014 at a bank in Wellesley, Massachusetts.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(All Defendants)**

78.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

79.    Defendants engaged in a fraudulent scheme by which they represented that they were managing legitimate loans.  Instead, the Defendants carried out a scheme by which investor funds were misappropriated for the Defendants' personal and business uses.

80.    By engaging in the conduct described above, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

81.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17

C.F.R. §240.10b-5].

### SECOND CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities in
Violation of Section 17(a) of the Securities Act
(All Defendants)**

82.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-81 above as if set forth fully herein.

83.     Defendants, directly and indirectly, acting intentionally, knowingly or recklessly,

in the offer or sale of securities by the use of the means or instruments of transportation or

communication in interstate commerce or by the use of the mails:  (a) have employed or are

employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or

property by means of untrue statements of material fact or omissions to state material facts

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or

courses of business which operate as a fraud or deceit upon purchasers of the securities.

84.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### THIRD CLAIM FOR RELIEF
**Fraudulent Conduct by an Adviser to a Pooled Investment Vehicle
Violation of Section 206(1) and 206(2) of the Advisers Act
(Daniel Thibeault, GL Capital, GLIS)**

85.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-84 above as if set forth fully herein.

86.     At all relevant times, Daniel Thibeault, GL Capital and GLIS were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)] .  Daniel Thibeault was an "investment adviser" due to his ownership, management and control of GL Capital and GLIS.   GLIS and GL Capital received compensation in the form of money from investors as compensation for investment advice.   Thibeault was in the business of providing investment advice concerning securities for compensation.

87.     As set forth above, Thibeault, GL Capital, and GLIS made materially false and misleading statements to their investment advisory clients and engaged in a scheme to defraud those clients by misappropriating money from them.

88.     As set forth above, Thibeault, and GL Capital knowingly or recklessly made materially false and misleading statements to the Fund's directors about the bona fide nature of the fictitious Taft loans in materials prepared for, and distributed to, the Fund's directors at periodic meetings, in quarterly and semiannual reports, and in the Fund's 2014 annual report filed with the Commission, which Thibeault signed as the Fund's president.

89.     Thibeault, GL Capital, and GLIS, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

90.     As a result, Daniel Thibeault, GL Capital, and GLIS have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1) & (2)].

## FOURTH CLAIM FOR RELIEF
### Other Equitable Relief, Including Unjust Enrichment and Constructive Trust
### (Relief Defendants)

91.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 90 above as if set forth fully herein.

92.     Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

93.     The Relief Defendants have received investor funds derived from the unlawful acts or practices of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

94.     Further, specific property acquired by the Relief Defendants is traceable to Defendants' wrongful acts and there is no reason in equity why the Relief Defendants should be entitled to retain that property.

95.     As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of the Relief Defendants that is traceable to Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a preliminary injunction, order freezing assets, and order for other equitable relief in the form submitted with the Commission's motion for such relief;

B.       Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and, as to Daniel Thibeault, GL Capital, and GLIS, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1) & (2)].

C.       Require Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.       Require the Relief Defendants to disgorge all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest, with said moneys to be distributed in accordance with a plan of distribution to be ordered by the Court;

E.       Require Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

F.       Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered;

G.       Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Marc Jones
Marc J. Jones (Mass. Bar No. 645910)
   Senior Trial Counsel
Rebecca Israel
   Senior Investigations Counsel
Kathleen Shields (Mass. Bar No. 637438)
   Senior Trial Counsel
Martin F. Healey (Mass. Bar No. 227550)
   Regional Trial Counsel

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8947 (Jones direct)
(617) 573-4590 (fax)
jonesmarc@sec.gov (Jones email)

DATED: January 9, 2015