United States District Court
District of Massachusetts

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DANIEL THIBEAULT, GL CAPITAL PARTNERS, LLC, GL INVESTMENT SERVICES, LLC, GRADUATE LEVERAGE, LLC (d/b/a GL ADVISOR AND GL HOLDINGS CORP.) and TAFT FINANCIAL SERVICES, LLC, | ) ) ) ) ) ) ) | Civil Action No. 15-10050-NMG |
| Defendants, | ) ) | |
| and | ) ) | |
| SHAWNET THIBEAULT and GL ADVISOR SOLUTIONS, INC. | ) ) ) | |
| Relief Defendants. | ) ) | |

### MEMORANDUM & ORDER

**GORTON, J.**

This case arises from an alleged ongoing dissipation of at least $16 million in misappropriated investor funds by defendants Daniel Thibeault ("Thibeault"), GL Capital Partners, LLC ("GL Capital"), GL Investment Services, LLC ("GLIS"), Graduate Leverage, LLC ("GL") and Taft Financial Services, LLC ("Taft") (collectively "defendants"). Thibeault is the President and CEO of GL, the parent entity of GL Capital and

-1-

GLIS.  He was the founder and portfolio manager of the investment fund GL Beyond Income Fund (the "Fund") until December, 2014.

Plaintiff Securities and Exchange Commission ("the SEC" or "the Commission") contends that defendants have and still are engaged in 1) fraudulent or deceptive conduct in connection with the purchase or sale of securities in violation of Rule 10b-5 of the Exchange Act of 1934 ("the Exchange Act") and 2) fraud in the offer or sale of securities in violation of Section 17(a) of the Securities Act of 1933 ("the Securities Act").  Moreover, plaintiff claims that Thibeault, GLIS and GL Capital have engaged in fraudulent or deceptive conduct while acting as investment advisers, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("the Advisers Act").

Pending before the Court is the plaintiff's emergency motion for entry of a temporary restraining order ("TRO"), which this Court construes as a motion for preliminary injunction 1) to prohibit the defendants from continuing to violate federal securities laws, 2) to freeze the assets of defendants and relief defendants, 3) to require the defendants and relief defendants to repatriate all proceeds of the fraud that are now located abroad, 4) to require the defendants and relief defendants to submit an accounting of investor funds and other assets in their possession, 5) to prevent the defendants and

relief defendants from destroying relevant documents and 6) to authorize the SEC to undertake expedited discovery. For the reasons that follow, plaintiff's motion will be allowed.

## I. Background

Defendant Thibeault is the principal of all the GL entity defendants: GL, GL Capital, GLIS and GL Advisor Solutions, Inc. ("GL Advisor"), all of which are investment and financial advisory businesses. GL Capital is an investment adviser. GLIS is also an investment adviser and purports to have approximately 700 clients and more than $130 million in assets under management. GL Advisor is a Philippine corporation that engages in the origination and servicing of loans owned or controlled by GL and its affiliates. Plaintiff contends that Thibeault and/or GL also founded and control Taft, a purported loan origination company whose operation appears to be controlled by Thibeault and GL.

Thibeault created the Fund in March, 2012 and was its President and sole or co-portfolio manager for most of its existence until he was terminated by the Fund in December, 2014. GL Capital characterizes the Fund as providing investors with direct access to a portfolio of high credit quality consumer debt predominantly from young professionals. From January, 2012 to December, 2014, GL Capital was the sole investment adviser of the Fund.

The SEC alleges that at least as early as February, 2013, defendants engaged in a fraudulent scheme to create fictitious loans to divert investors' money from the Fund. Defendants' scheme allegedly involved the fabrication of paperwork purporting to reflect numerous six-figure consumer loans using the names and personal information of individuals who were unaware that loans were being originated in their names. For example, Thibeault had taken out a loan of just under $300,000 in the name of his former college roommate without his knowledge. When contacted about a loan statement that was inadvertently sent out, Thibeault allegedly told his former roommate's accountant "not to worry about it."

Fund money disbursed for those fictitious loans were first transferred to Taft, which served as an intermediary, and then into bank accounts of the defendants and the relief defendants rather than to the purported borrowers. The disbursements were used for the defendants' personal and business expenses and for making interest payments on outstanding fictitious loans. The fictitious loans allegedly bear a program code of "TA" in the Fund's records. As of December, 2014, there were 40 loans bearing the program code "TA," with an aggregate value of approximately $16 million.

The documentation maintained by GL Capital for the "TA" loans is missing in part and contains material inaccuracies.

The purported "borrowers" birth dates are incorrect in at least 20 of the 26 loans for which promissory notes and other supporting documentation was produced by GL Capital. Such inaccuracies would make it virtually impossible to obtain accurate commercial credit scores for a purported borrower.

Between December, 2012 and November, 2014, approximately $8.5 million was transferred from GL's operating account at TD Bank to bank accounts in the name of relief defendant GL Advisor in the Philippines. The funds in GL's operating account in part paid for the monthly bills of an American Express card that was used by defendant Thibeault. The nature of the expenses on the American Express card, such as hundreds of dollars per month for videos on demand and e-reader purchases, thousands of dollars per month at the iTunes Music Store and purchases at home goods stores suggest that the card was sometimes used for personal expenses that also benefitted relief defendant Shawnet Thibeault, the wife of defendant Thibeault.

The whereabouts and disposition of much of money misappropriated from the Fund is currently unknown.

C. **Procedural History**

Plaintiff filed the instant lawsuit and emergency motion for a temporary restraining order on January 9, 2015. The Court held a hearing on the pending motion the following week.

## II. Plaintiff's Motion for a Preliminary Injunction

### A. Legal Standard

Generally, in order to obtain a preliminary injunction, the moving party must establish

> (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of friction) between the injunction and the public interest.

Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted). In the context of SEC enforcement proceedings, injunctive relief is warranted "upon a proper showing" of federal securities law violations. See Securities Act § 20(b), 15 U.S.C. § 77t(b); Exchange Act § 21(d)(1), 15 U.S.C. § 78u(d)(1).

> The requisite elements of a proper showing include at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of [federal securities laws].

S.E.C. v. Fife, 311 F.3d 1, 8 (1st Cir. 2002) (quoting Aaron v. S.E.C., 446 U.S. 680, 700-01 (1980) (internal quotations omitted). Such proof should be based on "reasonable inquiry and other credible information." S.E.C. v. Int'l Loan Network, Inc., 770 F. Supp. 678, 688 (D.D.C. 1991) aff'd, 968 F.2d 1304 (D.C. Cir. 1992).

Moreover, SEC requests for injunctive relief

> need not involve proof of irreparable injury or the inadequacy of other remedies as in the usual suit for

> injunction....Rather, the critical question in issuing an injunction is whether there is a reasonable likelihood that the wrong will be repeated.

S.E.C. v. Pinez, 989 F. Supp. 325, 333 (D. Mass. 1997) (internal citations and quotations omitted).

**B.  Application**

**1.  Likelihood of Success**

Plaintiff contends that it will likely prevail in proving that 1) the defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and 2) Thibeault, GL Capital and GLIS violated Sections 206(1) and (2) of the Advisers Act.

The Exchange Act prohibits any person, in connection with the purchase or sale of any security, from, directly or indirectly 1) employing any scheme to defraud, 2) making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made not misleading or 3) engaging in any act, practice or course of business that operates as fraud or deceit upon any person, in connection with the purchase or sale of a security. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  The Securities Act contains similar prohibitions for conduct in the offer or sale of any security. See 15 U.S.C. § 77q(a).

Plaintiff contends that the making of fictitious loans, creation of false documents to support those loans, the use of

the loan proceeds to fund business and personal expenses and the false representations by Thibeault on behalf of himself and the GL entities constitute material misrepresentations and a scheme to defraud investors. The SEC avers that each of the defendants substantially participated in the scheme, to wit: 1) GL received funds and pretended to service the fictitious loans and publicized the Fund despite its CEO's knowledge that Fund assets did not exist, 2) GLIS put client money into the Fund to keep the scheme running and to fund the fictitious loans, 3) GL Capital marketed and managed the Fund to obtain new money from investors and actively to conceal the fraudulent nature of the "TA" loans in the Fund and 4) Taft knowingly served as a straw entity to create an appearance of legitimacy for the "TA" loans and hid their true nature from investors and auditors by serving as a conduit for receiving the Fund's money and transferring it back to GL.

With respect to materiality of the fraudulent scheme, plaintiff contends that any investor would consider the fraudulent "TA" loans, which consisted of 40% of the Fund's purported assets, to be material. The SEC also avers that the defendants acted with scienter, a mental state embracing the intent to deceive or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). It contends that defendants knew the loans were fraudulent but repeatedly represented that the Fund

was a legitimate investment company that used investor funds properly.

Defendant Thibeault disputes various assertions made by the SEC in support of its motion. For example, he contends that the evidence relied upon by the SEC is insufficient to conclude that 1) Thibeault "founded and controls" Taft, 2) defendants directed that period interest payments be made on some fraudulent loans to give the appearance that the borrowers were current on the loans, 3) Thibeault was personally responsible for the creation of the Taft loans and at best, the evidence suggests that he may have originated the loans, 4) Thibeault had directed payments out of the GL bank accounts for his personal expenses, or 5) GLIS's disclosure of assets is grossly inflated.

The Court concludes that the Thibeault has not adequately contested plaintiff's claim that defendants violated various federal securities laws and that plaintiff is likely to show that the fraudulent scheme is material and that Thibeault acted with scienter. Here, Thibeault's scienter is imputed to the other defendants because he controlled each of those entities.

The same conduct that violates the antifraud provisions of the Exchange Act may also violate Sections 206(1) and (2) of the Advisers Act, which prohibit fraudulent conduct by investment advisers. See S.E.C. v. Rana Research, Inc., 8 F.3d 1358, 1363 n.4 (9th Cir. 1993) ("Section 206 parallels section 10(b) of the

Exchange Act"). GLIS and GL Capital are registered with the SEC as investment advisers and Thibeault was an investment adviser because he provided investment advice for compensation and because he controlled both GLIS and GL Capital. In light of the Court's determination that plaintiff is likely to succeed in proving that defendants have violated the Exchange Act, it also concludes that the SEC is likely to prove that GLIS, GL Capital and Thibeault violated the Advisers Act.

### 2. Likelihood of future violations and the remaining factors

Thibeault contends that the SEC has not shown any likelihood that he would commit further alleged violations because he was terminated as the Fund manager in December, 2014 and no longer has access to any investor funds to originate new loans or to make any decisions about Fund assets.

The Commission responds that defendants are likely to continue to violate the securities laws because their constant dissipation of assets and failure to replenish the Fund constitutes an ongoing misappropriation of investor funds. The SEC further argues that any action taken with respect to GLIS client accounts without full disclosure of prior fraudulent activity constitutes a further violation of their fiduciary duties under the Advisers Act. Moreover, plaintiff offers evidence that contradicts Thibeault's assertion that he no

longer has access to any investor funds. Specifically, it notes that roughly $15 million was transferred to GL's operating account at TD Bank and that $100,000 of that Fund was transferred to Thibeault's attorneys as recently as mid-December, 2014, indicating that Thibeault still has access to misappropriated funds.

The Court concludes that the SEC has made a sufficient showing that Thibeault and the related defendants are likely to continue to violate federal securities laws absent a preliminary injunction entered against them. The Court is also persuaded by plaintiff's arguments that the balance of harms and the public interest favor the imposition of injunctive relief to prevent further dissipation of the allegedly misappropriated investor funds and to protect potential future investors. Accordingly, the SEC is entitled to injunctive relief to prohibit the defendants from continuing to violate federal securities laws.

### III. **Plaintiff's request for other equitable relief**

Section 22(a) of the Securities Act and Section 27 of the Exchange Act

> confer general equity powers upon the district courts [so that] [o]nce the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy.

S.E.C. v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2d Cir. 1972). The SEC may therefore "seek other than injunctive

-11-

relief to effectuate the purposes of the federal securities laws. Id. at 1104.

### A. Asset freeze

Courts in the First Circuit apply the same four-part test for issuing a preliminary injunction when deciding whether to enter an asset freeze. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 161 (1st Cir. 2004). Irreparable harm may be shown "where there is a strong indication that the defendant may dissipate or conceal assets." Micro Signal Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005). Moreover,

> the disadvantages and possible deleterious effect of a freeze must be weighed against the consideration indicating the need for such relief.

Pinez, 989 F. Supp. at 336 (D. Mass. 1997).

The SEC contends that an asset freeze is necessary to prevent defendants from dissipating or concealing any remaining investor funds and to ensure that their assets are available to satisfy an eventual judgment for disgorgement and/or a penalty. Plaintiff asserts that it has evidence that millions of dollars have been transferred from Fund accounts to accounts controlled by defendants and relief defendant GL Advisor in the Philippines. Plaintiff contends that even after Thibeault was interviewed by the SEC and arrested by the Federal Bureau of Investigation in December, 2014, he continued to direct the

dissipation of assets from accounts that he controls. For example, records from TD Bank show wire transfers from the main GL operating account of $65,000 to a recipient in the Philippines and $100,000 for personal legal expenses after Thibeault was arrested.

Thibeault responds that the scope of the proposed asset freeze is overly broad because the SEC has not shown that most of the implicated accounts are connected to the alleged illegal activity. Thibeault asserts that the SEC even acknowledges that the fraudulent loans constituted 40% of the Fund's purported assets. Moreover, Thibeault contends that the asset freeze sought by the SEC would render him unable to pay attorneys' fees to defend against this civil case and the related criminal proceeding, which would jeopardize his Sixth Amendment right to retain counsel of his choosing.

While plaintiff has agreed to a so-called "carve-out" for living expenses, it argues that defendant is not entitled to similar consideration for attorneys' fees because he has no right either to spend investors' funds to retain defense counsel or to dissipate assets that should be preserved to pay an eventual judgment. Plaintiff alleges that the investors' losses of at least $16 million are far greater than Thibeault's assets.

In civil cases, an asset freeze is justified in equity when the likelihood of a significant violation has been shown and it

is unlikely there will be sufficient funds to pay a disgorgement remedy or a civil penalty in the event a violation is established at trial. See S.E.C. v. Stein, 2009 WL 1181061 at *1-2 (S.D.N.Y. Apr. 30, 2009); see also, S.E.C. v. Current Fin. Servs, 62 F. Supp. 2d 66, 67 (D.D.C. 1999) (refusing to allow a carve-out for defendant's attorneys' fees because "the potential disgorgement [the SEC] could receive in this case far exceeds the amount that is frozen in the account").

Although carve-outs to reimburse attorneys' fees are not granted as a matter of right in this District even for defendants facing criminal charges for violations of federal securities laws, courts have recognized a distinction between civil and criminal cases because the Sixth Amendment right to counsel protects an individual's right to a lawyer of her choice. See, e.g., S.E.C. v. FTC Capital Markets, Inc., 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010) ("Were [defendant] seeking to use frozen funds to pay her defense costs in a civil action, the fact that potential disgorgement in this case exceeds the amount of money that has been frozen might be sufficient to prevent this Court from releasing the funds. However, [defendant] seeks advancement of fees and expenses only in the criminal action against her." (internal citation omitted)). The United States Supreme Court has noted, however, that

> [a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney even if those funds are the only way that that defendant will be able to retain the attorney of his choice.

Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989).

The Court will therefore freeze the assets of all defendants but allow carve-outs for limited living expenses and attorneys' fees for Thibeault's defense in his parallel criminal proceeding. To negate the carve-out for attorneys' fees for Thibeault's criminal defense, the Commission has the burden of demonstrating that such funds are traceable to fraud. See, FTC Capital Markets, 2010 WL 2652405, at *7.

**B. Accounting**

Plaintiff requests that the Court issue an order for an accounting to determine the exact amount of investors' assets in the Fund and elsewhere, the present location of those assets and defendants' ability to recoup them. The SEC asserts that the limited bank records reviewed by its staff demonstrate that defendants have withdrawn millions of dollars from the Fund's accounts and it is unclear where those funds are currently located.

The Court concludes that an accounting is appropriate and therefore plaintiff's request will be allowed.

**C.  Repatriation**

The SEC asserts that a repatriation order is necessary to require the defendants to return $8.5 million of the Fund's money that has been transferred to accounts in the Philippines.

Thibeault responds that the SEC has not met its burden to warrant such a repatriation order because it has not alleged that the transfers were improper. He notes that the SEC has provided no information about the balance of the accounts or about the net fund transfers between the American and Philippine entities. Defendant instead asserts that on a net basis, GL Advisor has transferred more funds to the American entities than vice versa, which negates the SEC's theory that defendants have attempted to divert such proceeds by removing them from the United States.

Thibeault further claims that he does not have the ability to return the funds at issue in any event because GL Advisor is a separate entity controlled by an independent, five-member board of directors and although he is a member of that board, a return of the fund requires approval of at least three members.

The SEC disputes the claim that defendant is unable to initiate a transfer from GL Advisor's accounts by pointing out that 1) GL is a 99% owner of GL Advisor and 2) on at least one occasion, Thibeault has independently directed and signed for the wire transfer of funds from GL Advisor's bank account in

Manila, The Philippines. Plaintiff also contends that Thibeault's unsubstantiated argument regarding net transfers is a red herring because none of the money transferred from the Fund to Taft should have then been forwarded to GL Advisor in the Philippines.

The Court is persuaded that defendant has considerable control over GL Advisor and will issue a repatriation order with respect to the funds transferred from the Fund to that entity.

### D. Remaining requests

Plaintiff also requests an order expediting discovery and preventing the destruction of documents. Thibeault opposes the SEC's requests because the SEC has provided no justification for such an order. Recognizing the urgency of this matter, the Court will allow both requests.

### ORDER

For the foregoing reasons, the Court concludes that the plaintiff is entitled to injunctive relief as more fully described in the preliminary injunction attached hereto and plaintiff's motion (Docket No. 2) is therefore **ALLOWED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated January 21, 2015